# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# 5:06CV145-V

| | |
|---|---|
| IN RE: ) | *Bankruptcy Case No.:* 03-51940 |
| ) | *Chapter 7* |
| RAY ALLEN STAFFORD and ) | |
| GRETCHEN ANN STAFFORD, ) | |
| Debtors. ) | |
| _____ ) | |
| ) | |
| JAMES T. WARD, SR., Trustee, ) | *Bankruptcy Adversary Proceeding* |
| Plaintiff, ) | *Case No.:* 05-05009 |
| ) | |
| v. ) | |
| ) | |
| UNITRIN DIRECT PROPERTY & ) | |
| CASUALTY COMPANY, f/k/a ) | |
| KEMPER AUTO & HOME ) | |
| INSURANCE COMPANY; and ) | |
| DONALD HARRINGTON, d/b/a ) | |
| HARRINGTON CONSTRUCTION ) | |
| COMPANY, ) | |
| Defendants. ) | |
| _____ ) | |

**THIS MATTER** is before the Court on appeal from a summary judgment decision of The Honorable J. Craig Whitley, U.S. Bankruptcy Judge, partially in favor of the Trustee-Plaintiff. (Document #73)

### I. Factual Background

The home of Debtors Ray Allen Stafford and Gretchen Ann Stafford ("Debtors" or "the Staffords") was essentially destroyed by fire on or about October 22, 2001. Due to the severity of the damage, the Debtors elected to rebuild rather than attempt repairs. (Brzykcy Aff. ¶4)

The Debtors retained private counsel, Caryn Lee Brzykcy, to represent them in connection

with the loss and their attendant insurance claim.[1] (Brzykcy Aff. ¶¶1, 3) The house served as collateral for a deed of trust held by Chase Manhattan Mortgage Corporation ("Chase") as security for a debt to Chase in the amount of $70,000.00. (Document #62-1) The Debtors' home was insured by Kemper Auto & Home Insurance ("Kemper").[2] (Brzykcy Aff. ¶5)

As a result of the fire loss and the Staffords' insurance claim, in March 2002, Kemper issued a check in the amount of $120,908.26 payable to the Debtors, Chase, and Attorney Brzykcy. (Brzykcy Aff. ¶6 / Exh. A) In a letter dated March 15, 2002, Kemper advised the parties that the actual cash value payment of $120,908.26 was being processed, that the difference between $120,908.26 and the cost of the replacement structure up to the full repair cost of $146,517.11 (which equaled $28,608.85) would be paid "once we have the exact figure." (Brzykcy Aff. ¶6 / Exh. B) The $28,608.85 difference was referred to by Kemper as a "depreciation holdback." (Brzykcy Aff. ¶6) Kemper represented to counsel that the depreciation holdback of $28,608.85 was to be paid "upon completion of repairs." (Brzykcy Aff. ¶6 / Exh. C) The $120,908.26 check was endorsed by the Debtors and counsel and mailed to Chase in April 2002. (Brzykcy Aff. ¶7 / Exh. D)

Appellant Donald Harrington ("Harrington") was eventually hired to rebuild the Debtors's home.[3] In March 2002, while discussions were ongoing concerning rebuilding, Chase issued a document titled "The Insurance Account Disbursement Agreement" ("IAD Agreement"), which was to govern the disbursement of the Kemper insurance proceeds held by Chase. (Brzykcy Aff. ¶8 /

---

[1] Brzykcy represented the Debtors from approximately November 2001 through July 2003.

[2] Kemper is now known as "Unitrin Direct Property & Casualty Company." (Brzykcy Aff., ¶5)

[3] Harrington, a licensed general contractor, conducts business as Harrington Construction Company, a sole proprietorship. (Harrington Aff. ¶1)

Exh. E; Harrington Aff. Exh. B) Chase, Harrington, and the Debtors executed the IAD Agreement on March 26, 2002. (Brzykcy Aff. ¶8) Pursuant to the IAD Agreement, Chase was to:

> receive the executed Agreement, a copy of the contractor's work authorization, and an estimate of repairs. A check for one-third of the amount held would be disbursed upon receipt of these items. Another one-third would be disbursed after receipt of a property inspection confirming that repairs were one-half complete. The final one-third would be disbursed upon receipt of a final inspection confirming that the [Debtors'] New Residence was 100 percent complete, receipt of the insured's affidavit of completion, and a notarized contractor's affidavit....Chase was to deposit the funds received from Kemper "into a separate hazard loss expense account for [the Debtors'] loan." Checks were to be jointly payable to the Staffords [Debtors] **and to Harrington**.

(Brzykcy Aff. ¶8 / Exh. E; Harrington Aff. ¶5) (*emphasis added*). The IAD Agreement was to apply "to loans in good standing only." (Exh. E)

On May 1, 2002, the Debtors and Harrington signed the Construction Contract. (Harrington Aff. Exh. A) The initial contract price to rebuild was $152,860.00. (Harrington Aff. ¶4) Construction began on the Debtors' new house.

Chase disbursed $51,606.71 to the Debtors on or around April 30, 2002. This figure represented the "non-monitored" portion of the $120,908.26 check received from Kemper (*i.e.*, the funds in excess of Chase's outstanding mortgage balance). (Brzykcy Aff. ¶9) The Debtors were the sole payees on the $51,606.71 check. (Brzykcy Aff. ¶9) However, upon release of the "non-monitored funds," Chase advised the Debtors that "these funds may still need to be presented to your hired contractor for the restoration services provided." (Brzykcy Aff. ¶9 / Exh. F) In fact, Harrington received two payments totaling $43,000.00 from this initial disbursement of funds. (Harrington Aff. ¶6) At the same time, Chase disbursed the the first monitored draw of $23,100.51, constituting the first one third of the "monitored" funds. (Brzykcy Aff. ¶9) As required by the IAD Agreement, the payees on the $23,100.51 check were the Debtors and Harrington Construction

Company. (Brzykcy Aff. ¶9) However, Harrington was not identified as a joint-payee on the check for the second draw. (Harrington Aff. ¶9) Harrington did not receive the second draw payment immediately, but was ultimately paid on or around November 8, 2002 from "the escrow account" in the amount of $23,075.02. (Id.)

Approximately one year after the first disbursement, around April 14, 2003, Brzykcy received an inquiry from Kemper requesting verification that the dwelling was rebuilt, verification of the final cost, and a certificate of occupancy and supporting invoices. (Brzykcy Aff. ¶10 / Exh. G) Shortly thereafter, on April 30, 2003, the Alexander County Planning and Development Department approved the New Residence. A Work Order Form indicated: "Final OK / Enjoy your new home / Very nice job!" (Brzykcy Aff. ¶11 / Exh. I; Harrington Aff. ¶11) The Certificate of Occupancy was also issued on April 30, 2003.[4] (Harrington Aff. ¶12; Harrington Exh. F)

According to Harrington, the project was over budget and the parties were at an impasse in terms of how to proceed. (Harrington Aff. ¶10) The Debtors could not pay the additional funds necessary to cover costs incurred at their direction to complete the project, and Harrington was not willing to waive his general contractor's lien rights against the property. (Harrington Aff. ¶¶10, 33,34) The Debtors and Harrington sought out Debtors' counsel (Brzykcy), in June 2003 in an attempt "to resolve certain differences between them." (Brzykcy Aff. ¶15; Harrington MSJ ¶17)

---

[4] To the extent there is any question regarding the sufficiency of the April 30, 2003 documents as a trigger for final disbursement, Kemper representative Allen Stack explained:

> Usually, we ask for the certificate of occupancy as this proves the dwelling was rebui[l]t to code and ready for occupancy .... *If there is other information that we can use to verify the amount and that the dwelling was actually reconstructed we will accept that as well*.

(Brzykcy Aff. Exh. G) (*emphasis provided*).

The parties met with counsel on June 9, 2003, reached an agreement, and reduced the agreement to writing the same day. (Brzykcy Aff. ¶15 / Exh. M) Significantly, one of the provisions reads:

> Owners [Debtors] agree to submit within 14 days of today's date final invoices to the mortgage holder [Chase] and the hazard insurance company [Kemper] for final payment, and further agree to complete all necessary paperwork, inspection arrangements or any other items necessary **to secure payment to Contractor** from the mortgage holder **and** the hazard insurance company.

(Exh. M at 2, ¶4) (*emphases added*).

On June 27, 2003, Brzykcy forwarded Harrington's final invoice and a Certificate of Occupancy to Kemper. (Brzykcy Aff. ¶14 / Exh. K)

In or around June 30, 2003, Brzykcy received an email from Kemper indicating its willingness to make the check payable to contractors, if requested. (Brzykcy Aff. ¶13 / Exh. J) The same email explained that absent a specific request, typically, the insurance checks are made payable to the insured and the mortgagee. (Id.)

On or around July 2, 2003, Brzykcy received a letter from Kemper transmitting a policyholder's release and advising that the amount of $25,608.85 (*i.e.*, depreciation holdback) would be mailed to counsel forthwith. (Brzykcy Aff. ¶14 / Exh. L) The original Kemper check for $25,608.85 was issued on July 7, 2003, and required the endorsement of the Debtors and Chase. (Brzykcy Aff. ¶16 / Exh. N) Harrington was not identified as a payee. The original Kemper check for $25,608.85 was never deposited or cashed.[5] Thus, Kemper remained in possession of those funds. Chase refused to honor Harrington's request for the third and final draw. (Harrington's MSJ, ¶39)

---

[5] Harrington contends that Debtors' counsel never forwarded the check to Chase.

## II. Procedural History

This adversary proceeding stems from the Debtors' voluntary bankruptcy petition pursuant to Chapter 13 of the Bankruptcy Code, filed October 31, 2003.

In bankruptcy, Harrington submitted a secured Proof of Claim seeking to recover $82,777.56 from the bankruptcy estate. Harrington's Proof of Claim reflected the sum of payment he received *pre-petition* to be $89,004.02.[6] (Document #69 / Harrington Aff.) The Debtors objected to Harrington's claim. However, the claim was sustained by the bankruptcy court on July 8, 2004.

On September 16, 2004, the Debtors' case was converted to a Chapter 7 proceeding wherein James T. Ward, Sr., was appointed as Trustee. The Trustee eventually moved for summary judgment in this adversary proceeding, arguing in part that Harrington's claim was unsecured rather than secured.

Chase foreclosed on the Debtors' property and was able to satisfy its security interest in the property (via the Deed of Trust) with proceeds from the sale. (Trustee's Brf. 16) Harrington purchased the home in foreclosure on November 30, 2004, and subsequently adjusted his Proof of Claim. Harrington's adjusted claim is approximately $28,907.77. (Document #69 / Harrington Aff.)

During the pendency of these bankruptcy proceedings, Kemper moved for interpleader. The Kemper funds are now being held by the Clerk. The Chase funds are being held by the Trustee. Because Kemper and Chase have paid the monies at issue, both entities have since been voluntarily

---

[6] According to Harrington, the $89,004.02 was received as follows:

1) $43,000.00 from the non-monitered $51,606.71 payment that the Debtors received from Chase;
2) $22,929.00 from the first Chase draw;
3) $23,075.02, which was the entire second Chase draw.

dismissed from this adversary proceeding. (Adversary Proceeding Documents ## 25, 79)

In the bankruptcy court, the Trustee's motion for summary judgment was allowed in part and Defendant Harrington's motion for summary judgment was likewise denied in part. The bankruptcy judge rejected Harrington's trust theories, namely, that insurance proceeds disbursed after the fire loss at the debtors' residence were being held in trust or escrow for Harrington's benefit and, therefore, could not be deemed part of the bankruptcy estate. (Order ¶31) The bankruptcy judge determined that the nature of any claim Harrington may be entitled to in the case was unsecured. (Order ¶31) The bankruptcy court also found 1) that a material question of fact existed relative to the value of the property subsequent to entry of the Valuation Order; and 2) that because Chase's foreclosure potentially wiped out formal liens junior to Chase's, Defendant Harrington's unsecured claim could not include interest and attorneys' fees subsequent to the date of foreclosure. (Order ¶31) The bankruptcy judge declined to rule on the amount of any claim Harrington may hold given the existence of questions of material fact that were deemed to preclude judgment as a matter of law.[7] Appellant Harrington now seeks a ruling from this Court finding that his claim, subject to further fact-finding by the bankruptcy court, as a secured claim, be paid to him free of any claims of the Trustee.

### III. Discussion

The issue before this Court is whether Harrington has an equitable interest in the insurance proceeds as held by Kemper and Chase that elevates Harrington's interest above that of other creditors / claimants, namely, general unsecured creditors in an ordinary debtor-creditor relationship

---

[7] Upon this Court's finding that Harrington, in fact, has an equitable interest in the insurance monies, this matter will be remanded to the bankruptcy court for determination of the extent of Harrington's interest. (SJ Order, ¶31)

with the Debtors. Thus, the Court considers whether sufficient evidence exists such that imposition of an equitable trust in favor of Harrington is warranted. This inquiry "involves an application of Section 541 of the Bankruptcy Code as well as state law bearing upon the interests and rights of the parties" in that the substantive nature of the property rights held by a bankruptcy debtor and its creditors is defined by state law absent controlling federal bankruptcy law. *See* In re Surplus Furniture Liquidators, Inc. of High Point, 199 B.R. 136, 142 (M.D.N.C.1995) (*citing* In re Haber Oil Co., 12 F.3d 426, 435 (5th Cir.1994); Butner v. United States, 440 U.S. 48, 55 (1979)).

The bankruptcy estate is defined broadly. The bankruptcy estate generally includes, "all legal or equitable interests of the debtor in property as of the commencement of the case" wherever the property is located and by whomever held. In re Rowland, 140 B.R. 206, 207 (Bankr. S.D. Ohio 1992) (*citing* 11 U.S.C. §541(a) and (a)(1)). Section 541(d) further clarifies what constitutes property of the bankruptcy estate:

> "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, ***but not to the extent of any equitable interest in such property that the debtor does not hold***."

In re Rowland, 140 B.R. at 208 (*citing* 11 U.S.C. §541(d)).

The Trustee bears the burden of establishing that the Kemper and Chase funds are properly defined as property of the Debtors' estate and required to be turned over to the Trustee. *See* 11 U.S.C. § 542(a); In re Lamar, 249 B.R. 822, 824-25 (Bankr. S.D.Ga.2000). Indeed, pre-petition insurance policies and proceeds from those policies are considered property of the debtor's estate. *See* Am. Bankers Ins. Co. of Florida v. Maness, 101 F.3d 358, 364 (4th Cir.1996); In re Costa, 54 B.R. 22, 23 (Bankr. D.N.J. 1985) ("It is well settled that money payable as proceeds of a fire

insurance policy issued prior to the commencement of a bankruptcy proceeding falls within the purview of [§541(a)(1)]."). The Trustee also accurately explains the origin and nature of Chase's interest as a mortgagee and the satisfaction of said interest upon post-petition foreclosure.[8] (Trustee's Brf. 13-15)

Notwithstanding an initial determination that the insurance proceeds may be deemed property of the bankruptcy estate as falling within the statutory definition, to the extent Harrington has an equitable interest in the insurance proceeds, Harrington's interest is properly excluded from the estate by definition pursuant to 11 U.S.C. §541(d).

Accordingly, the Court looks to state law to evaluate further whether the facts support the existence of an equitable trust in Harrington's favor. *See* Butner, 440 U.S. at 55.

### a. Express Trust

An express trust may be created where there is an intent to create a trust expressed through a writing or conduct, by express or implied contract. YWCA of Asheville v. Morgan, 189 S.E.2d 169 (1972); Bowen v. Darden, 84 S.E.2d 289, 291 (N.C.1954) (express trusts are typically embodied in contract); *see also* James A. Webster, Jr., *Webster's Real Estate Law in North Carolina* §28-1, at 1083 (Patrick K. Hetrick & James B. McLaughlin, Jr. eds., 4th ed 1994). While no particular words are necessary to create an express trust, there must be sufficient words to create the trust, a definite subject, and an ascertained object. Id.; *see also* Tyson v. Henry, 514 S.E.2d 564 (1999).

### b. Trusts By Operation Of Law

In North Carolina, trusts by operation of law are classified as resulting trusts and constructive

---

[8] Harrington's alleged equitable interest in the insurance proceeds does not purport to compete with Chase's interest. Rather, Harrington claims he has a higher priority than other unsecured creditors after satisfaction of Chase's interest in the insurance proceeds.

trusts. Bowen v. Darden, 84 S.E.2d 289, 291 (N.C. 1954); Carcano v. JBSS, LLC, 684 S.E.2d 41, 49 (N.C.App. 2009). The North Carolina Supreme Court describes the distinctions between resulting and constructive trusts as follows:

> [T]he creation of a resulting trust involves the application of the doctrine that valuable consideration rather than legal title determines the equitable title resulting from a transaction; whereas a constructive trust ordinarily arises out of the existence of fraud, actual or presumptive – usually involving the violation of a confidential or fiduciary relation – in view of which equity transfers the beneficial title to some person other than the holder of the legal title. Also, a resulting trust involves a presumption or supposition of law of an intention to create a trust; whereas a constructive trust arises independent of any actual or presumed intention of the parties and is usually imposed contrary to the actual intention of the trustee.

Carcano, 684 S.E.2d at 49 (*quoting* Bowen, 84 S.E.2d at 292 (*internal citations omitted*)).

### i. Resulting Trust

As the bankruptcy judge explained, the presumed intent of the parties drives imposition of a resulting trust. (Order,¶25); Bowen, 84 S.E.2d at 292; Avery v. Stewart, 48 S.E. 775, 778 (N.C.1904).

> In North Carolina a resulting trust is a product of the application of equitable principles, invoked when a person uses the money of another to acquire legal title in property:
>
> > Under such circumstances equity creates a trust in favor of such other person commensurate with his interest in the subject matter. A trust of this sort does not arise from or depend on any agreement between the parties....

Am. Hotel Mg't Assocs., Inc. v. Jones, 768 F.2d 562, 568 (4th Cir.1985) (analyzing property interest in stock under North Carolina law for purposes of determining applicable statute of limitations).

> A resulting trust arises, if at all, in the same transaction in which legal title passes, and by virtue of consideration advanced before or at the time legal title passes, and not from consideration thereafter paid. The creation of a resulting trust

> depends on the intention, at the time of transfer, of the person furnishing the consideration, which intention is to be determined from the facts and circumstances surrounding the transaction. The intent of the party claiming the trust may be shown by evidence of statements made by the parties at or before the time title passes, and statements made by the grantee after title passes. Evidence of the parties' conduct, before and after title passes, is admissible on the issues of intent....

Ray v. Norris, 337 S.E.2d 137, 140 (N.C.App.1985) (*quoting* Mims v. Mims, 286 S.E.2d 779 (N.C. 1982)). A resulting trust may be found where an express trust was intended but fails in whole or in part. *See generally* 90 C.J.S. Trusts § 122.

"The doctrine of resulting trusts applies to both personal and real property." 90 C.J.S. Trusts § 122 (*internal citations omitted*); 76 Am. Jur.2d TRUSTS § 135 (*same*). To establish a resulting trust, the proponent of the trust must produce clear, strong, and convincing evidence. Bowen, 84 S.E.2d at 292.

The bankruptcy court held: "The facts of this case do not meet the elements of a resulting trust." (Order, ¶25) The bankruptcy court did not address whether Harrington provided valuable consideration or fully explore the parties' intent.

### ii. Constructive Trust

A constructive trust is imposed by courts "to prevent the unjust enrichment of the holder of title to, or of an interest in, property which [the] holder acquired through fraud, breach of duty, ***or some circumstance making it inequitable for him to retain it*** against the claim of the beneficiary of the constructive trust." *See* Wilson v. Crab Orchard Dev. Co., 171 S.E. 2d 873, 882 (N.C. 1970) *(emphasis added) (internal citations omitted)*. "Unlike the true assignment for benefit of creditors, which is an express trust, intended as such by the creator thereof, a constructive trust is a fiction of equity, brought into operation to prevent unjust enrichment through the breach of some duty or other

wrongdoing. It is an obligation or relationship imposed irrespective of the intent with which such party acquired the property, and in a well-nigh unlimited variety of situations." Wilson, 171 S.E.2d at 882 (*citations omitted*). While most constructive trusts arise from fraud, the North Carolina Supreme Court has held that "the absence of fraud alone is not necessarily fatal to a claim of constructive trust":

> "Inequitable conduct short of actual fraud will give rise to a constructive trust where retention of the property by the holder of the legal title would result in his unjust enrichment. Fraud need not be shown if legal title has been obtained in violation of some duty owed to the one equitably entitled."

Cury v. Mitchell, 688 S.E.2d 825, 827-28 (N.C.App. 2010) (*quoting* Roper v. Edwards, 373 S.E.2d 423, 424-25 (N.C. 1988)).

In the context of bankruptcy, courts have held that, generally, imposition of a constructive trust "runs counter to the goals of bankruptcy," namely, the ratable distribution of the bankruptcy estate to creditors. *See generally*, 1996 Ann. Surv.of Bankr. Law 2, *The Constructive Trust Remedy In Bankruptcy Cases* ("Under any analysis, the imposition of a contructive trust in a bankruptcy case is generally unsupported by any provision of the Bankruptcy Code and runs counter to the goals of bankruptcy."); 103 Com.L.J. 411, *The Continued Unsettled State Of Constructive Trusts In Bankruptcy: Of Butner, Federal Interests And The Need For Uniformity* (Winter 1998) (recognizing "considerable uncertainty" surrounding the law governing the imposition and recognition of constructive trusts in bankruptcy and the difficult policy conflict).

The bankruptcy judge accurately recited North Carolina law concerning constructive trusts, yet held that "[i]n the absence of fraud or a confidential relationship" (between Harrington and Kemper, Chase or the Debtors), it was precluded from finding that Defendant Harrington was

entitled to a constructive trust in either the Kemper or Chase funds. (Order ¶¶23,24) The bankruptcy court did not address unjust enrichment or other equitable principles as a potential basis for imposition of a constructive trust.

    **c. Application of Trust Theories**

As an initial matter, the Court agrees with the bankruptcy court that Harrington's express trust claim is not entirely supported by the relevant documents such as the Construction Contract and IAD Agreement as Harrington is not expressly named a "beneficiary" to the insurance proceeds in either document. (*See* Order ¶¶20-22) The IAD Agreement, however, expressly required Harrington to be a named payee on disbursement checks, an explicit recognition of his prospective rights in those funds notwithstanding the language acknowledging Chase's concurrent interest in protecting its loan. Likewise, the Debtors / Harrington agreement of June 9, 2003 set forth actions to be taken expressly "to secure payment to Contractor" from the remaining funds held by Kemper and Chase. This agreement came in the context of Harrington's unwillingness to waive lien rights also designed to secure payment to contractors. Evidence concerning the parties' intent and pre-petition conduct reasonably support such a finding of express trust. Nevertheless, because the burden of establishing an express trust is greater, the analysis herein is focused on trust by operation of law based upon an unjust enrichment theory.

Since the ultimate question is one of equity under either the resulting or constructive trust theory, the undersigned carefully considers whether Harrington has been wronged to a greater degree than any other creditor-claimant. Harrington argues that he is no ordinary unsecured creditor given that he provided labor and furnished materials for the rebuild with the understanding that he would be paid for both when the home was completed. Harrington's argument that he reasonably relied

upon representations concerning the existence of insurance monies and their availability for the rebuild is persuasive. Harrington further contends that Chase acted inequitably: 1) by failing to include Harrington as a co-payee on the check for the second draw as contemplated by the IAD Agreement; 2) by failing to disburse the final draw amount after all conditions for disbursement were satisfied.

According to Harrington, the Trustee acknowledges that the purpose of the IAD Agreement was "to ensure that the insurance proceeds were applied for this purpose." (Appellee's Brf. 6) In addition, counsel for the Debtors asserts that all of Kemper's requirements for disbursement of the insurance monies had been satisfied, which is why the final payment of $25,608.85 was issued. The Debtors' counsel opines that "all funds were held in trust in favor of Don Harrington." (Brzykcy Aff. ¶¶16, 17) Indeed, within a month of disbursement, the Debtors expressly indicated their intent to comply with the remaining contractual terms (IAD Agreement) so that final payment could be made <u>to Harrington</u>. (Brzykcy Aff. Exh. M)

According to Harrington, Chase's placement of the funds in a segregated account, and its characterization of the account as a "restricted escrow," provides the necessary basis for a finding in his favor. *(See* Appellant's Brf. 3, IV) (Wesley Aff.) Harrington's argument that the Kemper funds were held in "escrow" for Harrington's benefit, however, must be viewed along side of the language within the IAD explaining that the insurance monies are to be held in "a separate hazard loss expense account *for [the Debtors'] loan*." Appellee-Trustee points out that Kemper was aware that Chase was a loss payee on the Policy (due to the outstanding mortgage balance) and that Chase had set up a segregated account for insurance funds <u>*relative to the Debtors' loan*</u> – which is why some of the funds were to be "monitored" and the first sum disbursed was not. All indications are

that the separate hazard loss expense account served dual purposes, protecting Chase's security interest and preserving monies for the rebuild. (Trustee's Brf. 21 - IAD "set up an arrangement whereby the Policy proceeds would be held in "a separate hazard suspense loss account *for [the Debtors'] loan*" and be used to fund payments of construction.") Indeed, the parties contemplated that all of the insurance funds would ultimately go to Harrington, leaving the newly rebuilt residence as continuing security for the note held by Chase.[8]

The Construction Contract Harrington entered into with the Debtors does not mention that the Debtors had any insurance monies available to them or that the insurance monies would be the source of the Debtors' repayment. (Document #62-5) According to the Trustee, this is Harrington's primary factual obstacle as Harrington is essentially asking the Court to rewrite the terms of the written contract. Yet, imposition of a constructive trust is an *equitable* remedy available to avoid unjust enrichment. *See* Roper v. Edwards, 373 S.E.2d 423, 425 (1988) ("On the whole ... the constructive trust is seen by American courts today as a remedial device, to be used wherever specific restitution in equity is appropriate on the facts.") (*quoting* D. Dobbs, *Remedies* §4.3 (1973)). Thus, the undersigned finds that the absence of an explicit provision identifying the source of

---

[8] As discussed in Rowland, albeit with skepticism, there is support for the proposition that a constructive trusts exists where the debtor may serve as a "conduit" for funds owed to the beneficiary-claimant. With respect to insurance reimbursement for medical services rendered pre-petition, Congress stated:

> Situations occasionally arise where property ostensibly belonging to the Debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in constructive trust for the person to whom the bill was owed.

In re Rowland, 140 B.R. 206, 209-10 (Bankr. S.D. Ohio 1992) *(quoting S.Rep.No. 989, 95th Cong. 2d Sess. 82 (1978), U.S. Code Cong. & Admin. News 1978, p. 5869); see also*, 103 Com.L.J. 411.

payment in the Construction Contract alone is not determinative of these alternative trust theories.

The Trustee-Appellee relies on In re Rowland, which presents a similar factual scenario but is distinguishable nonetheless. *See* In re Rowland, 140 B.R. 206 (Bankr. S.D. Ohio 1992). The bankruptcy court in In re Rowland based its ruling solely on facts stipulated by the parties with nothing of record to enlighten the court as to the parties' intent. The bankruptcy judge identified the difficulty in finding in favor of the Appellant contractor:

> "The stipulation of facts is absolutely devoid of any reference to fraud, duress, unconscionable conduct, or artifice by the debtors. **The court has no evidence of any circumstances surrounding the creation of the contract between the debtors and the movant (e.g., whether the debtors made any type of promises regarding the insurance proceeds)** and finds no facts that comprise even the beginning of support for imposing a constructive trust . . . All that the court has before it is the fact that the debtors had funds with which to pay the repairs for which they contracted, but refused to do so. Generally, a mere breach of contract is insufficient to raise a constructive trust."

In re Rowland, 140 B.R. at 209-10 (*internal citations omitted*) (*emphasis added*). In re Rowland may also be distinguished by the fact that there was no contract to repair fire damage introduced into evidence for consideration by the bankruptcy court. *See* Rowland, 140 B.R. at 210 ("In the instant proceeding, no evidence, *e.g.*, a copy of the fire insurance policy, or a contract to repair fire damage, has been introduced to demonstrate that the debtors were to serve as a conduit for payment to the movant.")

Here, there is record evidence – both documentary and testimonial – supported by the IAD Agreement, signed by Chase, Harrington and the Debtors, showing that it was the Debtors' intent, as well as Kemper's, that all or the largest portion of the insurance proceeds held by Chase (the amount in excess of Chase's security interest or mortgage balance) was to be held for payment to Harrington as construction progressed on the new home. There is also evidence that the Kemper "depreciation holdback" funds were to be paid out upon completion of the rebuild of the Debtors'

residence. The Debtors' own attorney – the individual retained to represent the Debtors' interest with respect to their insurance claim – unequivocally avers the same.

Thus, the factual record supports imposition of an equitable trust.

**d. Timing & Creation Of Equitable Interest**

Having found that the factual record supports imposition of an equitable trust by operation of law, the Court is next asked to determine whether such an equitable interest would have come into existence upon execution of the Insurance Disbursement Agreement, or at the time of Kemper's release of funds, which both occurred before the bankruptcy petition was filed on October 31, 2003, or not until a hypothetical post-petition decision to employ the trust remedy.

In light of the manner in which "property of the [bankruptcy] estate" is defined, the timing of the creation of the equitable interest being asserted becomes key.[9] With respect to a constructive trust, the Supreme Court in Healy explained that the equitable property right does not arise until a court creates the constructive trust and imposes the duty to convey the *res*. Healy v. Comm'r of Internal Revenue, 345 U.S. 278, 282-83 (1953). Even so, a constructive trust has "a retroactive existence in legal fiction...." Healy, 345 U.S. at 283. Supporting the latter theory, "state law often treats the beneficiary (the successful claimant) as the equitable owner of the subject trust *res* as of (i.e., retroactive to) the date of the wrongful act, equating the remedy with a form of inchoate property interest which always existed ..." or becomes effective upon relation back such that "the successful claimant is entitled to "his property" immediately, to the exclusion of general unsecured creditors of the defendant." 103 Com.L.J. 411, 417-18. As for the creation of a resulting trust, timing is less problematic since the resulting trust is "a mere holding of the title for the benefit of

---

[9] Imposition of a trust is being requested post-petition based on conduct that occurred pre-petition. The definition of the bankruptcy estate directs the Court to the interests *"as of the commencement of the case ..."* (or initiation of bankruptcy proceedings via the bankruptcy petition). Rowland, 140 B.R. at 207 (*citing* 11 U.S.C. §541(a) and (a)(1)).

another" created according to the parties' intent and supply of consideration "before the time legal title passes." *See* Ray, 337 S.E.2d at 140; 90 C.J.S. Trusts § 122 (*internal citations omitted*). The record has ample evidence of the parties' intent and Harrington's pre-petition advance consideration is undisputed.

For these reasons, the undersigned finds that the timing of the creation of the equitable interest does not defeat Harrington's post-petition assertion of an equitable trust remedy.

### e. Harrington's Election To Seek A Contractor's Lien & Subsequent Foreclosure

The Trustee argues that even if the Court were to find imposition of a trust is warranted, later events destroyed Harrington's instant claim that he should have the status of a secured creditor rather than a general unsecured creditor. The Trustee bases this claim on Harrington's refusal to provide the necessary release or waiver of liens. Paragraph 8 of the May 1, 2002 Construction Contract reads:

> "Final payment shall not be due until Contractor has delivered to Owner complete releases for all claims arising from this contract, or receipts in full covering all labor and materials for which liens could be filed, or bond be furnished Owner against any such lien."

(May 1, 2002 Contract, ¶8) Despite this provision within the original contract, once the project was over budget and the Debtors' financial health had become an issue, Harrington elected to seek a lien on the property and refused to submit a Contractor's Affidavit as initially contemplated. To the extent the original contract was modified as a result of the June 2003 session with Bryznski, it follows that Paragraph 8 no longer governed the parties' respective obligations. *See e.g.,* Inland Constr. Co. v. Cameron Park II, Ltd., LLC, 640 S.E.2d 415, 418 (2007) (*internal citations omitted*) ("[P]rovisions of a written contract may be modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived. This principle has been sustained even where the instrument provides for

any modification of the contract to be in writing.")

Secondly, the Trustee appears to argue that in deciding not to pursue the contract amount, Harrington instead sought payment for a higher sum in light of the various changes agreed to by the parties during the rebuild. According to the Trustee, this decision was inconsistent with enforcement of the original contract and, therefore, extinguished Harrington's rights pursuant to the contract. The Trustee suggests that Harrington should be estopped from advocating for a higher creditor status. The Court disagrees. Because Harrington's remedy lies in equity, neither the Construction Contract or the IAD Agreement must serve as the primary basis for imposition of a resulting or constructive trust. Neither contract is determinative. Accordingly, this Court finds that the insurance monies, consistent with protection of Chase's security interest, were intended to be held in trust for the benefit of the Debtors and Harrington for the purpose of rebuilding the Debtors' home. The Court further finds that while not expressly identified as a beneficiary-payee on the Kemper Policy, Harrington was designated as the Debtors' co-payee pursuant to the IAD Agreement. Most importantly, the Court finds that Harrington provided valuable consideration in exchange for the interest he now asserts in the insurance proceeds and, therefore, is not similarly situated to other general unsecured creditors asserting a claim against the Debtors' estate. In sum, imposition of an equitable trust is warranted in order to prevent unjust enrichment.

## IV. Order

Defendant-Appellant Harrington's appeal is hereby **GRANTED**. This matter is **REMANDED** to the bankruptcy court for determination of the amount of Harrington's secured claim and resolution of any other issues that may be presented consistent with this opinion.

Signed: September 15, 2011

Richard L. Voorhees
United States District Judge